An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-398

Filed: 6 October 2015

Harnett County, No. 14 JA 48

IN THE MATTER OF: J.H.

Appeal by respondent-father from order entered 16 January 2015 by Judge Mary H. Wells in Harnett County District Court. Heard in the Court of Appeals 8 September 2015.

> *Duncan B. McCormick, Staff Attorney, for petitioner-appellee Harnett County Department of Social Services.*
>
> *Mary McCullers Reece for respondent-appellant father.*
>
> *Mary H. Mobley for guardian ad litem.*

McCULLOUGH, Judge.

Respondent-father appeals from an order concluding that the juvenile J.H. ("Jenny")[1] was neglected and that it was in the juvenile's best interest to remain in the custody of the Harnett County Department of Social Services ("DSS"). After careful review, we affirm.

The instant action stems from a report DSS received on 1 November 2013 alleging abuse and neglect of Jenny's seven-week-old brother, L.H. ("Landon").

---

[1] Pseudonyms have been used to protect the identity of the juveniles and for ease of reading.

Landon had been admitted to Cape Fear Hospital and was being treated for serious injuries that appeared to be non-accidental in nature. Prior to Landon's injuries, both children were in the custody of their parents.

Jenny's parents later recounted the events that occurred on 1 November 2013. Respondent-father left for work early that morning, while the rest of the family was still sleeping. After the mother awoke, she dressed herself, dressed Jenny, and then fed Landon a bottle. Landon appeared to be doing well. A friend took the mother, Landon, and Jenny to the babysitter's house, and the mother then went to work.

Respondent-father left work early and picked the children up from the babysitter around 3:30 p.m. Landon appeared well; he did not have any visible injuries. Landon slept during the 30-minute drive home, but respondent-father woke him when they arrived home and fed him a bottle. Respondent-father left Landon in his car seat for a short time, but he awoke around 4:30 p.m. and was fussy. Respondent-father moved Landon to a bassinet in the parents' bedroom, and he fell asleep again. Respondent-father then tended to Jenny and did some chores. Respondent-father heard grunting from the bedroom and went to check on Landon. Landon appeared fussy, so he changed Landon's diaper and prepared another bottle. Respondent-father placed Landon in the bassinet, propped up a bottle, and then resumed his chores.

Respondent-father returned to check on Landon fifteen minutes later. Respondent-father claimed that Landon looked as if he was "fighting for air." He picked Landon up, and Landon continued gasping for air. Respondent-father moved him from shoulder to shoulder in an attempt to assist his breathing. Landon then spit up a combination of formula and blood and went limp. Respondent-father called his wife, and then called 911. Respondent-father performed CPR on Landon, as instructed by the 911 operator, but Landon kept gasping for air. Paramedics then arrived at the family's home, and were successful in getting Landon to breathe on his own. When the mother arrived home from work, the paramedics were preparing to transport Landon to the hospital.

Dr. Richard Cartie, a pediatric intensivist, was Landon's treating physician upon admission. Dr. Cartie diagnosed Landon with abusive head trauma, bleeding in the brain, and retinal hemorrhaging. Dr. Cartie opined that Landon's injuries were the result of intentional child abuse, and that his injuries occurred close in time to his inability to breathe. Dr. Cartie consulted with a neurosurgeon and child abuse specialist, and the physicians concluded that nothing surgical could be done to treat Landon, given the extent of his injuries. Landon died two days after being admitted. The medical examiner concluded that his death was a homicide after determining that the probable cause of death was blunt force head injury and non-accidental

trauma. An autopsy was performed on 7 April 2014, and that examiner also opined that Landon's cause of death was complications from blunt force head injuries.

On 15 April 2014, DSS filed a petition alleging that Jenny was a neglected juvenile. The petition specifically alleged that Jenny's environment was injurious to her welfare because the parents "cannot/will not provide information to determine what happened to [Landon]" and that the mother remained supportive of respondent-father, despite the fact that he was the children's caregiver when Landon's injuries were sustained. On the same day, the trial court entered an order giving DSS nonsecure custody of Jenny, but allowed Jenny to be placed with the mother. Following a lengthy hearing, the trial court entered an order on 16 January 2015 concluding that Jenny was a neglected juvenile in that she lived in an environment injurious to her welfare. The trial court found that respondent-father's explanation was not consistent with the injuries seen by Dr. Cartie; that neither parent offered a plausible, non-accidental reason for Landon's injuries; and that Jenny lived in a home where another juvenile died of a result of suspected abuse. The trial court also concluded that it was in Jenny's best interest to remain in DSS custody, but that DSS was authorized to place Jenny with the mother. Respondent-father appeals.

On appeal, respondent challenges the trial court's adjudication of neglect. A neglected juvenile is defined as:

> A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian,

> or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.

N.C. Gen. Stat. § 7B-101(15) (2013). Additionally, this Court has required "that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide 'proper care, supervision, or discipline.' " *In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (quoting *In re Thompson*, 64 N.C. App. 95, 101, 306 S.E.2d 792, 796 (1983)).

"Allegations of neglect must be proven by clear and convincing evidence. In a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997) (citations omitted). If competent evidence supports the findings, they are "binding on appeal." *In re McCabe*, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003) (citations omitted). Respondent-father does not challenge the evidentiary support for any of the trial court's findings of fact. As a result, the findings of fact are presumed to be supported by competent evidence and are binding on appeal. *See In re M.D.*, 200 N.C. App. 35, 43, 682 S.E.2d 780, 785 (2009).

Respondent-father argues that the findings of fact are insufficient to establish a conclusion that Jenny lived in an environment injurious to her welfare or was exposed to a substantial risk of impairment. Specifically, he argues that there is nothing connecting Landon's death to Jenny's welfare, and that prior abuse of another child, standing alone, is insufficient to support an adjudication of neglect. *See In re J.C.B.*, ___ N.C. App. ___, ___, 757 S.E.2d 487, 489-90 (2014); *In re N.G.*, 186 N.C. App. 1, 9, 650 S.E.2d 45, 51 (2007).

We are not persuaded. The statutory definition of neglect specifically provides that "[i]n determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile . . . has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C. Gen. Stat. § 7B-101(15). We have held "that the weight to be given that factor is a question for the trial court[.]" *In re A.S.*, 190 N.C. App. 679, 690, 661 S.E.2d 313, 320 (2008), *aff'd per curiam*, 363 N.C. 254, 675 S.E.2d 361 (2009). "Section 7B–101(15) affords 'the trial court some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside.'" *N.G.*, 186 N.C. App. at 8-9, 650 S.E.2d at 50 (quoting *In re McLean*, 135 N.C. App. 387, 395, 521 S.E.2d 121, 126 (1999)).

Respondent-father is correct in his assertion that "the fact of prior abuse, standing alone, is not sufficient to support an adjudication of neglect." *N.G.*, *Id.* at 9,

650 S.E.2d at 51. Indeed, this Court "has generally required the presence of other factors to suggest that the neglect or abuse will be repeated." *J.C.B.*, ___ N.C. App. at ___, 757 S.E.2d at 489. However, the instant case is not one where the adjudication of neglect was based solely on prior abuse of another child.

We have previously affirmed adjudications of neglect where another child in the home was abused and the parents failed to take responsibility for that child's injuries. *See, e.g., N.G.*, 186 N.C. App. at 8-10, 650 S.E.2d at 50-51 (affirming adjudication of neglect where the respondents' parental rights to another child were terminated and they failed to acknowledge culpability for that child's injuries); *A.S.*, 190 N.C. App. at 690-91, 661 S.E.2d at 320-21 (affirming an adjudication of neglect of a child where the mother intentionally burned another child's foot and falsely claimed that the burning was accidental). Here, the trial court's adjudication of neglect was based not only on the fact that Landon sustained deadly injuries, but also on the fact that the parents failed to take responsibility for the injuries. All of the medical professionals involved in the case were of the opinion that Landon died of non-accidental injuries. Respondent-father was responsible for Landon's care when the injuries were sustained, yet he denied responsibility and his explanation was not consistent with the injuries. Moreover, the mother testified that she stood by respondent-father and thought that he had nothing to do with Landon's injuries. The trial court's findings of fact show the weight given to Landon's non-accidental death,

as well as the lack of a plausible explanation for the injuries. Based on *N.G.* and *A.S.*, we conclude that the trial court's findings of fact were sufficient to support its conclusion that Jenny lived in an environment injurious to her welfare. We therefore affirm the order of the trial court.

AFFIRMED.

Judges BRYANT and INMAN concur.

Report per Rule 30(e).